IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CHARLES SAMUEL JOHNSON, JR.                                        PLAINTIFF

v.        Civil No. 4:19-cv-04136

SERGEANT GRIFFIE, ET. AL                                        DEFENDANTS

## REPORT AND RECOMMENDATION

The Plaintiff, Charles Samuel Johnson, Jr., originally filed this *pro se* action on October 16, 2019, pursuant to 42 U.S.C. § 1983.  (ECF No. 1).  Plaintiff's application to proceed *in forma pauperis* was granted and Plaintiff's Complaint was ordered to be served upon the Defendants. (ECF No. 3, 6).  An Amended Complaint was filed on April 6, 2020.  (ECF No. 19).

Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 37).  The Plaintiff has responded (ECF No. 46) to the Motion and the matter is now ripe for decision. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

### I.  FACTUAL BACKGROUND

Plaintiff's Amended Complaint sets forth three claims based on incidents which allegedly occurred on September 24, 2019, and September 26, 2019.  (ECF No. 19).  All three claims concern the same general allegations:  Plaintiff claims that another inmate tried to attack him on September 24, 2019, in the presence of Defendant Burns.  Plaintiff alleges that the attempted attack was reported to Defendant Griffie and others and that following the September 24 incident, he should have been kept separate from the other inmate. Plaintiff then alleges that on September 26 the other inmate attacked him near a stairway in the presence of Defendant Ferral.  Plaintiff claims that he

1

informed Defendant Ferral of the September 24 attempted attack just prior to the September 26 attack and that Defendant Ferral should have kept him separate from the other inmate. (ECF No. 19 at 4-11).

Plaintiff claims that the Defendants violated his constitutional rights when they failed to protect him from the other inmate. Plaintiff's first claim is stated against Defendants Griffie, Ferral and Adams. Plaintiff's claims seem to be centered on his allegation that Griffie, Ferral, and Adams knew of the September 24 incident and failed to ensure that he was kept separated from the other inmate. The claim is stated against the Defendants in both their personal and official capacities. (ECF No. 19 at 6-7). Plaintiff's second claim is stated against Defendant Burns, in both his personal and official capacities. Plaintiff claims that Burns also violated his constitutional rights by failing to protect him from the inmate attack. Plaintiff states Burns knew of the September 24 incident and that on September 24, Burns told him that the other inmate "would get another chance to so." (ECF No 19 at 8). Finally, Plaintiff's third claim is stated against Defendants Adams, and Griffie, in both their personal and official capacities. In this claim, Plaintiff alleges failure to protect and "supervisory liability" and asserts that Adams and Griffie knew of the September 24 incident and failed to properly train the other officers to keep the inmates separated. (ECF No. 19 at 10).

Defendants' Motion for Summary Judgment attaches several exhibits: (1) an Affidavit of Warden Jeffie Walker; (2) Plaintiff's Arrest and Booking Records; (3) Plaintiff's requests and grievances; (4) an Incident Report concerning the September 26, 2019 incident; and, (5) certain Miller County Sheriff's Office Code of Conduct provisions. (ECF No. 39).

Plaintiff has responded to the Defendants' Motion and also submits exhibits including: (1) certain Miller County Sheriff's Office Training and Staff Development provisions; (2) Defendants' Responses to Plaintiff's written discovery; (3) Plaintiff's grievances records; (4) Plaintiff's

Disciplinary Report records;   (5) Plaintiff's Disposition of Sanction Hearing Records; and (5) Plaintiff's offense report records.  (ECF No. 46).

After reviewing the summary judgment pleadings submitted, I find the following material facts not in dispute:

On August 2, 2019, Plaintiff was booked into the Miller County Detention Center.  (ECF No. 39-2).

On September 26, 2019, Officer Ferrel completed an Incident Report, stating:

I, Officer Ferrel, was getting inmate Charles Johnson ready for disciplinary court in Max Echo. Once I entered the Pod, I was aware that Inmate Owens had beef with Inmate Johnson. Inmate Owens was secured in the cell to prevent altercations. Inmate Paxton asked me if he could have a couple more minutes to shower before his recreation time was up. Mistakenly, I approved. I then walked up to 015 where Inmate Charles Johnson was housed. I opened the door and escorted him down the stairs. All of the sudden, inmate Charles Johnson started to bow up on Inmate Paxton. Officer Labit entered the Pod, both inmates were separate. I, Officer Ferrel, lost grip on Inmate Paxton and he then charged at Inmate Johnson for further contact. Both inmates were separated and secured in their assigned housing.

(ECF No. 39-4 at 2).

On September 26, 2019, Officer N. Labit submitted an incident report, stating:

"On 9-26-19 at approximately 10:51, I, Officer Labit, along with Officer Ferrel, was working on the Max End. I was placing an inmate back in Max Alpha while Officer Ferrel was gathering inmate Charles Johnson for disciplinary court. After placing the inmate back in his cell in Max Alpha, I exited the pod and made my way to Max Echo where Inmate C. Johnson was housed at and Johnson came into my field of view, looking aggressive. I instantly called for Max Echo Door as I got within reach of it and I saw Officer Ferrel in the pod along with inmate Kamon Paxton, who is housed in Cell 012, underneath inmate Johnson. As I called for the door, the two inmates started fighting with each other and officer Ferrel attempting to separate them. As soon as the door opened, officer Ferrel found on inmate Paxton while I focused on inmate Johnson. I held inmate Johnson away from inmate Paxton in the corner while I left officer Ferrel tend to inmate Paxton and keep him away. Soon after, inmate Paxton starts throwing punches over and around my head while I still have Johnson in the corner. In an effort to separate them further, I ushered inmate Johnson back into his cell, cell 015, while inmate Paxton was being placed back in his cell, cell 012. Both inmates received medical examination/treatment and were placed back in their cells without further incident." [sic]

(ECF No. 39-4 at 4).

On September 27, 2019, Plaintiff submitted a response to the incident report, stating:

"I was going to court I did not do anything this was orchestrated by the officer. Why would he be out if we just had words 2 days before going to R&D"  [sic]

(ECF No. 39-4 at 3).

On September 27, 2019, Plaintiff submitted an inmate grievance, stating:

"Yesterday on 9/26/19 officer Ferral came to my cell to get me for disciplinary court, he let me out of my cell but did not put inmate Washington.  A inmate which I had just about got into a fight with 2 days prior, this incident was brought to the attention of Sgt. Griffie on 9/24/19 an therefor should have been noted to all officers not to let us around each other during this altercation Officer Lebo secured me as suppose while Ferral let this other inmate loose to assault me."  [sic]

(ECF No. 39-2 at 1).

In response, Admin. G. Officer replied,

"We take allegations such as the one you have made very seriously.  We would like to remine you the disciplinary action will be taken against you if it is found that you have made false allegations.  We also want to assure you that if necessary, appropriate measures will be taken to address your concerns."  [sic]

Subsequently, Cpt. G. Adams closed the grievance.

(ECF No. 39-3 at 1).

On September 27, 2019, Plaintiff submitted an inmate grievance, stating:

"I'm housed in a POD where no other cell should come out with another cell.  Sgt. Griffie knew about the almost fight between me an another inmate that happened on 9/24/19 so did other officers but yet he allowed one of his officers to let this inmate out at the same time as me.  Sgt. Griffie allowed this to happen because of prior lawsuits I've filed on him an I called him a HOUSE NIGGA on 8/22/19.  Sgt. Griffie is inciting violence between inmate an staging fights."  [sic]

In response, Admin. G. Officer replied,

"We take allegations such as the one you have made very seriously.  We would like to remind you the disciplinary action will be taken against you if it is found that you have made false allegations.  We also want to assure you that if necessary, appropriate measures will be taken to address your concerns."  [sic]

4

Subsequently, Cpt. G. Adams closed the grievance.

(ECF No. 39-3 at 2).

On October 1, 2019, Plaintiff submitted an inmate grievance, stating:

"About my last 2 grievances the inmate that I should not have been around is named Paxton not Washington.  I mistakenly thought it was Washington."  [sic]

In response, Admin. G. Officer said,

"I will take your request into consideration."

(ECF No. 39-3 at 3).

On October 4, 2019, Plaintiff submitted an inmate grievance, stating:

"I've stated to Cpt. Adams in a request that I fear for my safety an would like to be housed alone do to the fact of prior incidents in this facility he denied my request doing so is violation of my right to be protected an I will file a lawsuit if such right is violating."  [sic]

In response, Admin. G. Officer replied,

"I have forwarded you a request to the appropriate authority."

(ECF No. 39-3 at 4).

On October 5, 2019, Plaintiff submitted an inmate grievance, stating:

"On 9/24/19 it was brung to Sgt. Griffie attention that another inmate in Max-E tried to attach me.  Sgt. Griffie did are did not inform Officer Ferral of this either way this inmate should not have been around me to attack me on 09/26/19.  I informed Officer Ferral of this inmate who ignored my plea by stating "Ah he's just going to take a shower I'll wait til your in the hall to put cuffs on you." All this after this inmate tried to attack me on 9/24/19 also I was housed in a pod where I cell at time."  [sic]

In response, Admin. G. Officer replied,

"We take allegations such as the one you made very seriously.  We would like to remind you that disciplinary action will be taken against you if it is found that you have made false allegations.  We also want to assure you that if necessary, appropriate measures will be taken to address your concerns."

Subsequently, Sgt. B. Griffie responded,

"Your request is ambiguous and contains no identifiable request or complaint.  We
suggest that you be more specific so that we may address whatever is concerning
you."

(ECF No. 39-3 at 5).

On October 6, 2019, Plaintiff submitted an inmate grievance, stating:

"On 9/24/19 after an inmate tried to attack me as me and him were getting ready to
get escorted to R&D. Officer Burns was the one escorting the other inmate upon
returning from R&D with this inmate as Burns was leaving out of Max-E he stated
somewhere along the ling of "oh he'll get to be around you again & that he should
arrange for it now" meaning that the other inmate would get another chance to
attack me which is what happened 2 days later.  You can check the video footage
of Max-E Burns at door."  [sic]

In response, Admin. G. Officer replied,

"We take allegations such as the one you have made very seriously.  We would like
to remind you the disciplinary action will be taken against you if it found that you
have made false allegations.  We also want to assure you that if necessary,
appropriate measures will be taken to address your concerns."

(ECF No. 39-3 at 6).

On October 8, 2019, the Disciplinary Committee reported that Plaintiff came to a hearing.

The Discipline Committee, found, "after considering . . . all evidence and information available,"

that "[t]he inmate committed the infraction."  The Disciplinary Committee report further states:

"[a]fter the inmate came to the hearing he/she decided to accept the offer that was
originally given to him/her.  This is expectable to Cpt. Adams and I therefore he/she
signed the original offer page.  Sanction is for 30 days."

(ECF No. 39-4 at 6).

On October 10, 2019, Plaintiff submitted an inmate grievance, stating:

"I went to Dis Court on 10/8/19 I just received my findings & it says that I
changed my mind an plead guilty to the 2-4 charge.  I never plead guilty to
any charge.  I stated that that inmate was not suppose to be around me
because he tried to attack me on 9/24/19.  That signature that is on that paper

is from Officer Golden aacidently having me sign in the wrong place when
he brung me the paper before Dis Court.  Mr. Kim Watson is lying about
what went on at Dis Court an charging me with a bogus charge [sic]

In response, Admin G. Officer stated "Designated inactive."

(ECF No. 39-3 at 7).

On October 14, 2019, Plaintiff was released on parole with the State of Arkansas.  (ECF

No. 39-2 at 1-4).

According to the Affidavit of Warden Walker, when a physical altercation occurs at the

Miller County Detention Center ("MCDC"),  MCDC Staff complete an incident report. (ECF No.

39-1 at 1).

According to the MCDC Policies and Procedures:

It is the policy of the Miller County Detention Facility to identify and objectively
classify inmates, housing each in a manner which provides for the security and good
order of the facility and best suits the needs of the inmates. The degree of custody
required for each inmate is based on sound classification assessment and practices,
to ensure that the risk posed to staff, other inmates, the public or themselves is
minimal.

(ECF No. 39-5 at 7).

"Reclassification may occur for the following reasons: … 3. Due to protective custody

needs, per staff or the inmate's own request…" (ECF No. 39-5 at 16).

"Inmates who require special housing to ensure their safety, the safety and security of the

facility or the safety of other inmates shall be housed in Administrative Segregation."  (ECF No.

39-5 at 16).

"A 'KEEP SEPARATED' list and a 'MEDICAL ISOLATION' list shall be maintained by

the Classification and Risk Management Department in consultation with the Warden, Captain,

and Lieutenant." (ECF No. 39-5 at 18).

Inmates to be kept separated shall not, under any circumstances, have the same outdoor exercise period in the same outdoor exercise area, nor shall they be afforded the opportunity to come into contact with one another while being escorted to or from housing areas or their rooms.

(ECF No. 39-5 at 18).

"It is the policy of the Miller County Jail to operate a safe, professional, and efficient

manner and to maintain and use a written training and staff development plan for all employees."

(ECF No. 39-5 at 4).

According to the MCDC Policies and Procedures:

All new Corrections Officers will receive basic orientation and training within their first nine months of employment. Training for this group will include security and search procedures, use of force, staff rules and regulations, supervision of inmates, report writing, inmate rules and regulations, inmate's rights, emergency procedures, interpersonal communications skills, first aid and CPR. This will be presented through the jail's FTO program and by the Training Sergeant.

(ECF No. 39-5 at 4).

New officers will receive basic orientation training and introduction to the Detention Facility before the FTO program. The Warden, Captain, or administrative assistant will present the division's philosophy/ethics and principles upon initial hiring. New Officers will also be scheduled for OC training within first 30 days of employment.  All new employees will meet with the Detention Warden during training.

(ECF No. 39-5 at 5).

All employees will receive monthly training.  This may include security procedures, defensive tactics (for those employees who have inmate contact), rights and responsibilities of inmate, emergency procedures, firearms, interpersonal relations, communication skills, first aid/CPR, and job task procedures.

(ECF No. 39-5 at 5).

"It is the policy of the Miller County Jail to ensure proper conduct among its personnel and

members. All Jail Personnel and Members shall adhere to all Sheriff's Office General Orders and

Jail Operating Procedures."  (ECF No. 39-5 at 1).

The following are excerpts from Plaintiff's written discovery submitted to the Defendants:

- INTERROGATORY NO. 1:  Plaintiff would like for Defendants Sgt. Griffie, Officer Ferral & Officer Burns to answer the questions of:  In Miller County Jail's Max E pod (segregation) is it policy that only one cell is supposed to be out at a time?

  RESPONSE:  Objection. . . . Without waiving said objection, generally only one inmate in Max E pod is out at a time.  However, decisions concerning individual detainees are made based on the facts and circumstances presented at the time.  Those decisions are influenced by a number of factors including, but not limited to, the detainee's behavior, medical or mental health issues, available personnel and resources, available space, and policy considerations.

- INTERROGATORY NO. 2:  Plaintiff would like for Sgt. Griffie to answer the question of Sgt. Griffie was it brung [sic] to your attentions on 9/24/19 in R&D by Officer Jones that inmate Paxton had just tried to attack Plaintiff in Max-E & that he needed to be kept away from the Plaintiff?

  RESPONSE:  Not that I recall.

- INTERROGATORY NO. 6:  Plaintiff would like for Officer Burns to answer the question.  Did he know to keep inmate Paxton away from Plaintiff because he had on 9/24/19 tried to attack the Plaintiff?

  ANSWER:  Objection . . . . Without waiving said objection, Officer Burns heard Inmate Paxton and Inmate Johnson arguing through the doors.

- INTERROGATORY NO. 7:  Plaintiff would like for Officer Ferral to answer the question.  Did Sgt. Griffie inform him of the 9/24/19 attempted attack on Plaintiff by inmate Paxton & that he should not be around Plaintiff?

  ANSWER:  No.

- INTERROGATORY NO. 10:  Plaintiff would like to ask Sgt. Griffie did he & other officers form a line between Plaintiff & Paxton in R&D on 9/24/19 to prevent Paxton from getting to Plaintiff?

  ANSWER:  I do not recall the alleged incident.

- DISCOVERY NO. 18:  Plaintiff would like to ask Sgt. Griffie as sgt. Is it your job to notify his officers of a threat of violence from one inmate to another so to keep inmate safety?

  ANSWER:   . . . . Generally, MCDC staff members will inform one another regarding threats of violence between inmate.  In addition, there is a tracking and

separation list on the computer that keeps officers informed of inmates that are to be kept apart.

- <u>DISCOVERY NO. 22</u>:  Plaintiff would like to ask Officer Kam Burns did Officer Jones & his self [sic] stop inmate Paxton from attacking Plaintiff on 9/24/19.

  <u>RESPONSE</u>:  No. Inmate Paxton did not try to attack Plainitff on 9/24/19.

(ECF No. 46 at 19, 33-37, 41).

Plaintiff attaches to his summary judgment response several grievances from 2016.  On August 17, 2016, Plaintiff submitted a grievance concerning his safety with respect to his cell mate.  Defendant Adams responded to Plaintiff's grievance stating:

Every cell you enter of if your housing is not suitable you claim suicide watch or you claim to have a problem.  I have housing reports to substantiate this.  Cell was checked along with inmates and there property.  I believe your property is the one that was found with hidden razors inside.

(ECF No. 46 at 20).

On August 18, 2016, Plaintiff again submitted a grievance concerning his safety with respect to his cell mate.  Defendant Adams responded to Plaintiff's grievance stating:

Again you are using that trying to manipulate your housing situation which you have done in the past.
(ECF No. 46 at 21).

Defendant Adams responded again to a grievance involving the same concerns on August 23, 2016:

No findings to indicate he assaulted you.  your property was the one found with hidden razors.

(ECF No. 46 at 22).[1]

In the instant Motion, the Defendants argue that they are entitled to summary judgment. Specifically, the Defendants argue that there is no proof of personal involvement by Defendants

---

[1] Plaintiff also submitted several disciplinary records from 2016.  These records do not seem to be relevant to the instant action.

Case 4:19-cv-04136-SOH   Document 49   Filed 11/30/20   Page 11 of 17 PageID #: 285

Adams, Griffie, or Burns; that the Defendants did not fail to protect the Plaintiff; and that, alternatively, they are entitled to qualified immunity. Plaintiff denies that the Defendants are entitled to summary judgment.

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from violence at the hands of other prisoners. *See Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir.

11

1998).  However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer,* 511 U.S. at 834.  "Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*"  *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).

To prevail on his failure to protect claim, Plaintiff must satisfy a two-prong test.  He must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) prison officials were "deliberately indifferent [to his] health or safety."  *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).  The first prong is an objective requirement to ensure the deprivation of a constitutional right is sufficiently serious.  *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010).   "The deprivation is objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm."  *Id.* (internal punctuation marks and citations omitted).

The second prong, however, is subjective requiring Plaintiff show the official "both knew of and disregarded 'an excessive risk to inmate's health or safety.'"  *Holden*, 663 F.3d at 341 *(quoting Farmer,* 511 U.S. at 837).  "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it."  *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007).  Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate."   *Davis v. Oregon Cnty.,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).  Plaintiff "need not show 'that a prison official acted or failed to act believing that harm actually would befall an inmate, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'"  *Nelson*, 603 F.3d at 447 (*quoting Farmer*, 511 U.S. at 842).

12

"Moreover, 'in order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm.'" *Id.* (*quoting Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007)).

### A.  Individual Capacity Liability

Plaintiff's claims for failure to protect stem from an alleged incident on September 24, 2019, and a subsequent alleged incident on September 26, 2019.   Plaintiff alleges that on September 24, another inmate, who it appears Plaintiff first thought was named Washington but is actually named Paxton, "tried to get around Officer Burns to attack me."  (ECF No. 19 at 4). Plaintiff contends that Defendant Burns was present during the attempted attack and that other Defendants discussed the September 24 incident amongst themselves and specifically knew that Plaintiff needed to be kept separate from Paxton.

Plaintiff then contends that on September 26, Paxton attacked him causing trauma to his eye, eardrum and head.  (ECF No. 19 at 10).  Defendant Ferral was the only Defendant present and personally involved when the September 26 incident occurred.   Plaintiff claims he told Defendant Ferral about Paxton's attempt just prior to the September 26 incident.  (ECF No. 19 at 5).

It is important to note that Plaintiff lacks evidentiary proof to support most of his claims concerning an attempted attack by Paxton on September 24, 2019.  Plaintiff did not file a grievance concerning the September 24 incident.  And, although in discovery responses Defendant Burns admits to having heard Plaintiff and Paxton "arguing through the door" on September 24, Burns denies having to "stop inmate Paxton from attacking Plaintiff on 9/24/19" and specifically states "Inmate Paxton did not try to attack Plaintiff on 9/24/19."  (ECF No. 46 at 35, 41).  No other

Defendant recalls any knowledge of a confrontation between the Plaintiff and Paxton prior to September 26, 2019.

It is also important to note that both Defendant Ferral and Officer Labit's incident reports characterize Plaintiff as the instigator in the incident involving Paxton. (ECF 39-4 at 2, 4). Specifically, Ferral states that the Plaintiff "started to bow up" on Paxton. (ECF No. 39-4 at 2). Labit first noticed Johnson "looking aggressive." (ECF No. 39-4 at 4). Further, following a disciplinary procedure as a result of the September 26 incident, Plaintiff was found to have committed an infraction and was sanctioned for a period of thirty (30) days. (ECF No. 39-4 at 6).

It is recognized that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998). As set forth above, in order to establish a case, Plaintiff must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). Viewing the undisputed facts in the light most favorable to the Plaintiff, there is no summary judgment proof that Plaintiff was "incarcerated under conditions posing a substantial risk of serious harm;" **or** that the Defendants were "deliberately indifferent [to his] health or safety." Rather, the summary judgment proof offered shows the Defendants involved in the incident acted quickly to protect Plaintiff and the other inmate.

### B. *Respondeat Superior* Liability / Failure to Train

In Plaintiff's third claim, he argues that Defendants Griffie and Adams are liable under *respondeat superior* or failure to train theories. (ECF No. 19 at 9).

14

A claim of deprivation of a constitutional right cannot be based solely on a *respondeat superior* theory of liability. *See Monell v. Department of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone Cnty Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted).

However, a supervisor can be held liable if his failure to train or supervise the offending actor who ultimately caused the constitutional deprivation. *Audio Odyssey, Ltd. v. Brenton First Nat'l. Bank*, 245 F.3d 721, 742 (8th Cir. 2001). In *Parrish*, the Eighth Circuit set forth the requirements for liability for failure to supervise. 594 F.3d at 1002. Under *Parrish*, in order for Plaintiff to establish liability as a supervisor, he must show Defendants Griffie and Adams: "1) Received notice of a pattern of unconstitutional acts committed by subordinates; 2) Demonstrated deliberate indifference or tacit authorization of the offensive acts; 3) Failed to take sufficient remedial action; and 4) That such failure proximately caused [his] injury[.]" *Id.* (citations omitted). A supervisor may also be held liable for a failure to train an inferior officer "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. In such a situation, a plaintiff must also prove that the alleged failure to train 'actually caused' the constitutional deprivation." *Parrish*, 594 F.3d at 1002.

Because the Court has found no constitutional deprivation based on Plaintiff's failure to protect claims, there is no basis on which to hold Defendants Adams or Griffie liable based on failure to supervise or train liability.

**C. Qualified Immunity**

Having found that the facts do not make out a constitutional violation, the Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

(unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### D. Official Capacity

Plaintiff also sues Defendants in their official capacities.  Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities.  *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998).  With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity."  *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).   In other words, Plaintiff's official capacity claims against Defendants are treated as claims against Miller County, Arkansas.  *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor."  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013).  To establish liability on the part of the Miller County under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).  To establish the existence of an unconstitutional policy, the plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

In *Johnson v. Douglas Cty. Med. Dep't.*, 725 F.3d 825 (8th Cir. 2013), the Court outlined the necessary elements for establishing the existence of an unconstitutional custom:

> To establish a claim for "custom" liability, [Plaintiff] must demonstrate: 1) The existence of a continuing, widespread, persistent pattern of unconstitutional

misconduct by the governmental entity's employees; 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) That Plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was the moving force behind the constitutional violation.

*Id.* at 838 (citations omitted).

Plaintiff has not identified any policy or custom of the Miller County Detention Center which contributed in any way to the alleged violation of Plaintiff's rights. The policies of the Miller County Detention Center produced here show the opposite, and require officers to protect inmates' rights. Accordingly, Plaintiff's official capacity claims against Defendants fail as a matter of law.

The Defendants are entitled to summary judgment on Plaintiff's official capacity claims.

### IV. CONCLUSION

For the reasons stated above, I recommend that Defendants' **Motion for Summary Judgment (ECF No. 37)** be **granted**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of November 2020.

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE